# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE INTERMOUNTAIN STROKE CENTER, INC., AND DR. NANCY FUTRELL,<br><br>        Plaintiffs,<br><br>v.<br><br>INTERMOUNTAIN HEALTH CARE, INC.; IHC HEALTH SERVICES, INC.; AND SELECTHEALTH, INC.,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND REMANDING REMAINING CLAIMS TO STATE COURT**<br><br>Case No. 2:13-cv-00909-DN<br><br>District Judge David Nuffer |

Plaintiffs claim that Defendants engaged in misrepresentations that violated the Lanham Act[1] and Utah's Truth in Advertising Act,[2] and committed the state law tort of intentional interference with Plaintiffs' actual or prospective economic relations.

The complaint was initially filed in Utah State Court. Defendants removed to federal court under 28 U.S.C. § 1441(a). Jurisdiction is proper under 15 U.S.C. § 1125, 28 U.S.C. § 1331, and 28 U.S.C. § 1367(a).

Defendants filed a motion to dismiss all claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[3] The motion is granted with respect to Plaintiffs' Lanham Act claim. The remaining state law claims are remanded to Utah State Court.

---

[1] 15 U.S.C. §§ 1125(a) (2012).

[2] Utah Code Ann. §§ 13-11a-1 to -6 (West 2013).

[3] Defendants' Motion to Dismiss the First Amended Complaint (Motion to Dismiss), docket no. 7, filed Oct. 9, 2013.

# Contents

INTRODUCTION ................................................................................................. 2

Standard on Motion to Dismiss.......................................................................... 4

Discussion .......................................................................................................... 5

A.     IHC'S Alleged Misrepresentations ........................................................ 5

B.     Lanham Act ............................................................................................ 8

    1.     General Marketing Claims Regarding Quality ..................................... 9

    2.     Misleading Statements as to the Number of Stroke Specialists Employed by IHC
................................................................................................................. 15

    3.     Code of Ethics Statements ................................................................ 17

    4.     IHC's "Life After Stroke or TIA" Pamphlet....................................... 21

C.     State Law Claims.................................................................................. 23

Order ................................................................................................................ 24

## INTRODUCTION

Defendants—Intermountain Health Care Inc., IHC Health Services Inc., and SelectHealth Inc. (collectively, "IHC")—are Utah Corporations.[4] SelectHealth Inc. is a Health Maintenance Organization that offers insurance plans within the State of Utah.[5] IHC Health Services owns and operates hospitals and clinics in Utah and Idaho.[6] Both entities are wholly owned subsidiaries of Intermountain Health Care Inc.[7]

Plaintiff Dr. Nancy Futrell ("Dr. Futrell") is a physician licensed to practice in Utah.[8] She is board certified in neurology and vascular neurology and specializes in the treatment of strokes

---

[4] First Amended Complaint at 2, ¶¶ 3-5, docket no. 2-10, filed Oct. 7, 2013.

[5] *Id.* at 2, ¶ 5, 10, ¶ 16.

[6] *Id.* at 6, ¶¶ 12–13.

[7] *Id.* at 2, ¶¶ 4–5.

[8] *Id.* at 12, ¶¶ 22–24.

and transient ischemic attacks ("TIAs").[9] Until March 24, 2013, Dr. Futrell practiced at the Intermountain Stroke Center Inc. ("Stroke Center").[10]

The Stroke Center closed on March 24, 2013.[11] According to Plaintiffs, it was forced to do so largely as a result of IHC's conduct.[12] Plaintiffs allege that the standard of care with respect to stroke and TIA treatment requires that the patient either be immediately hospitalized or be seen within forty-eight hours at a same-day, urgent-care stroke clinic.[13] Plaintiffs allege that IHC frequently saw stroke and TIA patients in IHC emergency rooms, failed to hospitalize such patients, and refused to refer them to the Stroke Center—the only same-day, urgent-care stroke clinic in Utah.[14] As a result, according to Plaintiffs, stroke and TIA patients treated by IHC often received sub-standard care.[15] Because treatment at the Stroke Center was not covered by IHC insurance, many stroke and TIA patients were forced to settle for IHC's allegedly sub-standard treatment.[16] Plaintiffs claim that if IHC had attempted to meet the standard of care by referring patients to the Stroke Center, or if IHC had covered treatment at the Stroke Center under IHC insurance plans, Plaintiffs would have had many more patients than they did.[17]

Plaintiffs allege that IHC misled patients and consumers regarding the nature of their stroke and TIA care. According to Plaintiffs, IHC's advertising represents that IHC provides

---

[9] *Id.*

[10] *Id.*

[11] *Id.* at 11, ¶ 19.

[12] *Id*.

[13] *Id.* at 14, ¶ 31.

[14] *Id.* at 17, ¶¶ 40–43.

[15] *Id.* at 15, ¶ 33.

[16] *Id.* at 43, ¶ 127.

[17] *Id*. at 42, ¶ 126.

high quality and low cost care while employing the best medical practices.[18] Plaintiffs allege that IHC failed to meet the standard of care for stroke and TIA treatment and did so in a manner that increased treatment costs for IHC patients.[19] Similarly, Plaintiffs allege that IHC's website and other materials distributed by IHC are designed to lead patients and consumers to believe that IHC employs a large number of physicians who specialize in the treatment of stroke and TIA,[20] though IHC "is nearly devoid" of stroke specialists who are in a position to provide treatment in accord with the standard of care.[21] Finally, Plaintiffs allege that IHC falsely represents that it attempts to avoid inappropriate sources of revenue and carefully reviews its financial relationships for compliance with federal laws that prohibit rewarding physicians for referrals.[22] According to Plaintiffs, IHC recently entered into a settlement agreement with the United States Department of Justice for violations of those very laws.[23]

Plaintiffs claim that IHC's statements violated both the Lanham Act[24] and Utah's Truth in Advertising Act ("UTIAA").[25] Plaintiffs also claim that IHC intentionally interfered with Plaintiffs' actual and prospective economic relations.[26]

## STANDARD ON MOTION TO DISMISS

A party may move to dismiss a complaint under Rule 12(b)(6) where the plaintiff has failed to state a claim upon which relief can be granted. For purposes of a 12(b)(6) motion, the

---

[18] *Id.* at 22, ¶ 55.

[19] *Id.* at 30, ¶¶ 80–82.

[20] *Id.* at 26, ¶ 66.

[21] *Id.* at 26, ¶ 64.

[22] *Id.* at 31–32, ¶ 86.

[23] *Id.* at 32, ¶ 87.

[24] *Id.* at 39–41, ¶¶ 108–117.

[25] *Id.* at 35–39, ¶¶ 101– 108.

[26] *Id.* at 41–53, ¶¶ 118–163.

allegations of fact in a complaint are accepted as true and construed in the light most favorable to the non-moving party.[27] However, the court is "not bound by conclusory allegations, unwarranted inferences, or legal conclusions."[28] "[T]o withstand a motion to dismiss, a complaint must contain enough allegations of fact to state a claim for relief that is plausible on its face."[29]

## DISCUSSION

### A.  IHC'S Alleged Misrepresentations

Plaintiffs allege that IHC misrepresented the quality, character, and expense of IHC's treatment options for stroke and TIA patients, as well as the nature of its business practices generally. Those alleged misrepresentations form the basis of Plaintiffs' claims under the Lanham Act and UTIAA. They fall into four categories.

First, Plaintiffs allege that IHC made general claims in their marketing which are likely to mislead as to the quality of IHC's stroke and TIA treatment. IHC advertises that it "contribute[s] to . . . best medical practices, and raising the standard of clinical excellence";[30] employs "best medical practices," or "what works best," to provide quality healthcare at reduced costs;[31] provides the "best possible care";[32] and provides "excellent care of the highest quality at an affordable cost."[33] IHC's SelectHealth Medicare Advantage insurance plan is marketed to seniors—the population most at risk of stroke and TIA—and is advertised as providing access to

---

[27] *Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226, 1236 (10th Cir.1999).

[28] *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994).

[29] *Robbins v. State of Okl. ex rel. Dep't of Human Services*, 519 F.3d 1242, 1247 (10th Cir.2008) (citation omitted).

[30] First Amended Complaint at 19, ¶ 49.

[31] *Id.* at 19–20, ¶ 50.

[32] *Id.* at 20–21, ¶ 53.

[33] *Id*. at 21, ¶ 54.

"an exceptional level of care and value."[34] Plaintiffs claim that these representations lead

consumer to believe that IHC provides low cost care of high quality for the treatment of stroke

and TIA.[35] Instead, according to Plaintiffs, IHC provides sub-standard stroke and TIA treatment

at increased cost.[36]

     Second, Plaintiffs allege that IHC misleads consumers as to the number of physicians

employed by IHC who specialize in the treatment of stroke and TIA and who are available to

provide such treatment in accord with the standard of care. The IHC website lists stroke care

under "Heart and Vascular Services."[37] A "Find a Doctor" link on the portion of the site devoted

to stroke care lists heart and vascular surgeons, but not vascular neurologists or stroke specialists,

as treatment providers.[38] The website does not disclose the fact that IHC is "nearly devoid of

board certified neurologists and vascular neurologists specializing in the treatment of stroke and

TIA patients" who are in a position to provide follow-up care within forty-eight hours of a stroke

or TIA.[39] An annual stroke report issued by IHC represents that its Neuroscience Institute is

available to provide "resources for patients with ongoing needs after hospitalization" and access

to "subspecialists including epileptologists, general neurologists, physical medicine and

rehabilitation physicians, and neuropsychologists."[40] Plaintiffs claim that these representations

are "calculated to mislead or confuse [IHC] stroke and TIA patients into believing that a wide

range of physicians are available to treat them for stroke and TIA . . . ."[41]

---

[34] *Id*. at 29, ¶¶ 72–74.

[35] *Id*. at 22, ¶ 55.

[36] *Id*. at 31, ¶¶ 83–84.

[37] *Id*. at 25, ¶ 62.

[38] *Id*. at 26, ¶ 65.

[39] *Id*. at 26, ¶ 64.

[40] *Id*. at 27, ¶ 69.

[41] *Id*. at 26, ¶ 68.

Third, Plaintiffs allege that IHC engaged in misrepresentations concerning their efforts to avoid inappropriate sources of revenue and their efforts to comply with federal laws that prohibit the practice of compensating physicians for referrals. IHC's Code of Ethics claims that IHC will avoid "compensation arrangements in excess of fair market value" and "actions that inappropriately create revenues . . . ."[42] Instead, according to Plaintiffs, IHC refused to refer patients to the Stroke Center or to provide insurance coverage for treatment at the Stroke Center.[43] IHC did so, Plaintiffs allege, to avoid diverting income from IHC,[44] with the result that stroke and TIA patients received sub-standard care at increased costs.[45]

IHC's Code of Ethics also states that IHC will "review financial relationships with physicians and other Health Care Practitioners for compliance with anti-kickback and Stark laws. All financial arrangements and legal contracts with physicians must have Legal Department Review. [IHC] will not improperly induce or reward referrals of patients or services as prohibited under these laws and regulations."[46] Despite these representations, IHC entered into an agreement with the United States Department of Justice in April of 2013 to settle claims arising out of an improper compensation scheme in which physicians were rewarded for the value of their referrals.[47] Plaintiffs claim that this settlement agreement shows that IHC's representations regarding their compliance with federal law are false.[48]

---

[42] *Id*. at 30, ¶¶ 77–78.

[43] *Id*. at 30, ¶ 80.

[44] *Id*.

[45] *Id*. at 30–31, ¶¶ 81–83.

[46] *Id*. at 31–32, ¶¶ 86.

[47] *Id*. at 32, ¶ 87.

[48] *Id*.

Finally, Plaintiffs point to a pamphlet—entitled "Life After a Stroke or TIA"—available through IHC's website.[49] The pamphlet instructs that "after stroke patients are released from the hospital they should see a primary care physician within 1 to 7 days, and a neurologist within 4 to 6 weeks."[50] According to Plaintiffs, "a TIA patient who reads this pamphlet is likely to be under the mistaken impression that he or she can safely wait 4 to 6 weeks before following up with a neurologist."[51]

### B. Lanham Act

Plaintiffs attempt to state a claim for violation of the Lanham Act, 15 U.S.C. § 1125(a). To do so, they must allege:

> (1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.[52]

A representation may be misleading for purposes of the Lanham Act without being literally false.[53] Otherwise, the "clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed."[54] A false or misleading representation is material if "it is likely to influence the purchasing decision."[55]

---

[49] *Id.* at 23–24, ¶ 59.

[50] *Id.*

[51] *Id.*

[52] *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002) (citation omitted).

[53] *Cottrell, Ltd. v. Biotrol Intern., Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999).

[54] *Id.* (citation and internal quotation marks omitted).

[55] *Zoller Labs., LLC. v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004) (unpublished).

Only those who can allege a competitive injury as a result of the misrepresentation may bring a claim for falsely representing the character of goods or services.[56] The misrepresentation must be "harmful to the plaintiff's ability to compete with the defendant."[57]

Whether a statement is false or misleading and gives rise to a competitive injury is generally a factual question for a jury.[58] Nevertheless, the complaint must adequately plead a claim for relief. If the factual allegations of the complaint are accepted as true, it must be plausible, not merely possible, that the plaintiff is entitled to the relief requested. The court is not obligated to accept merely conclusory allegations or unwarranted inferences from the factual allegations.

Plaintiffs appear to suggest that IHC's statements are false, not merely misleading.[59] In either case, Plaintiffs fail to state a plausible claim for relief under the Lanham Act. Many of IHC's statements are not assertions of fact for which IHC may be held liable under the Lanham Act. With respect to the remaining statements, Plaintiffs have either not adequately alleged that the statements are misleading or have not adequately alleged that they gave rise to a competitive injury. As a result, Plaintiffs' Lanham Act claim is dismissed.

### 1. General Marketing Claims Regarding Quality

Plaintiffs allege that IHC misled consumers and patients as to the quality of its care by stating that it provides "high quality care," "the best possible care," "excellent care of the highest quality at an affordable cost," and that it employs "best medical practices." IHC argues that these

---

[56] *Hutchinson v. Pfeil*, 211 F.3d 515, 520 (10th Cir. 2000).

[57] *Barrus v. Sylvania*, 55 F.3d 468, 470 (9th Cir. 1995).

[58] *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 931 (9th Cir. 2010).

[59] First Amended Complaint at 40, ¶ 111.

are not statements of fact for which IHC can be held liable under the Lanham Act.[60] IHC is correct.

Expressions of sales "puffery" are not actionable under the Lanham Act. Whether a statement constitutes mere puffery is a question of law that can be resolved on a motion to dismiss.[61]

The Tenth Circuit Court of Appeals has not defined 'puffery' in the context of the Lanham Act, though it has done so in the context of liability for negligent misrepresentation.[62] Puffery refers to "vague generalities that no reasonable person would rely on as assertions of particular facts."[63] This definition is consistent with definitions provided by other Circuits in the Lanham Act context. The Ninth Circuit, for instance, understands 'puffery' to refer to a statement that "is extremely unlikely to induce consumer reliance."[64] "[A] statement that is quantifiable, that makes a claim as to the specific or absolute characteristics of a product, may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery."[65]

---

[60] Motion to Dismiss at 19.

[61] *See, e.g., Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121 (10th Cir. 1997) (finding that the district court correctly held as a matter of law that certain statements were mere puffing for which the defendant could not be held liable under securities laws and granting motion to dismiss); *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) (holding that "[d]istrict courts often resolve whether a statement is puffery when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and we can think of no sound reason why they should not do so"); *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 21 (E.D.N.Y. 2009) (holding that "whether an alleged misrepresentation is an actionable statement of fact or mere puffery is a matter of law"); *Saltzman v. Pella Corp.*, 06 C 4481, 2007 WL 844883, at *4 (N.D. Ill. Mar. 20, 2007) (holding that it is "appropriate in the context of a motion to dismiss, for a court to decide, as a matter of law, whether a statement is non-actionable puffery").

[62] *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009).

[63] *Id.*

[64] *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008).

[65] *Id.*

Plaintiffs argue that IHC's representations cannot be puffery because they are objectively false.[66] According to Plaintiffs, the standard of care for stroke and TIA patients requires that patients either be hospitalized or seen within forty-eight hours at a same-day, urgent-care stroke clinic.[67] Plaintiffs claim that because IHC did not meet this standard, IHC's claim to provide "high quality care" was objectively false and, because it is objectively false, it cannot be puffery.[68]

In determining whether a statement is puffery, the literal falsity of the statement is not dispositive. Instead, the crucial question is whether any "reasonable person would rely on [the relevant statements] as assertions of particular facts."[69] Puffery amounts to "a seller's privilege to lie his head off, so long as he says nothing specific, on the theory that no reasonable man would believe him, or that no reasonable man would be influenced by such talk."[70] "Mass advertising expressed in vague terms (as in political campaigns) is not relied on by rational adults."[71]

Plaintiffs acknowledge that most of the statements about which they complain are "focused on the [IHC] brand and not on specific services or offerings, such as post-stroke or TIA care . . . ."[72] IHC claims with respect to its services generally that it provides "the best possible

---

[66] Plaintiffs' Memorandum in Opposition to Rule 12(b)(6) Motion to Dismiss (Opposition Memorandum) at 21–22, docket no. 12, filed Nov. 19, 2013.

[67] *Id*.

[68] *Id*.

[69] *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009). *See also TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 830 (C.D. Cal. 2010) (holding that a statement was puffery despite the fact that it could be proven false because "[w]hether a statement is puffery does not depend on the truth or falsity of a statement; it depends on the degree of generality or specificity").

[70] *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000) (internal quotation marks and citation omitted) (quoting W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 109, at 757 (5th ed.1984)).

[71] *Alpine Bank*, 555 F.3d at 1102.

[72] First Amended Complaint at 22, ¶ 56.

care" and "excellent care of the highest quality at an affordable cost." The only statements linked more directly to IHC's stroke and TIA care are vague claims to the effect that IHC provides the "highest quality care."[73] Claims as to high quality and low cost—even if linked to a particular product or service and even if false—are paradigmatic examples of puffery upon which no reasonable person would be expected to rely.[74]

Plaintiffs point to IHC's use of the term "best medical practices" as a specific representation regarding the quality of IHC stroke and TIA treatment.[75] According to Plaintiffs, the claim to employ best medical practices is understood in the medical profession as making a specific claim regarding quality of care.[76] Plaintiffs identify two of IHC's statements that use the term "best medical practices."[77] First, IHC claims that "all three Intermountain divisions—Health Services, SelectHealth, and the Intermountain Medical Group—contribute in essential ways to the sharing of best medical practices, and raising the standards of clinical excellence."[78] Second, IHC claims that "[b]y identifying and implementing best medical practices—what works best—Intermountain not only provides quality healthcare; it often achieves lasting improvements in cost structures."[79]

---

[73] *Id*. at 23, ¶ 58.

[74] *See, e.g.*, *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1008 (7th Cir. 2004) (promise to provide "high quality care" to nursing home residents was mere puffery upon which no reasonable person could be expected to rely); *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) (collection service's claim to be the "low cost commercial collection experts" was mere puffery); *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 708 F. Supp. 2d 1209, 1241 (D.N.M. 2010) (claim that product was "best in the world" was mere puffery); *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1140 (C.D. Cal. 2005) (claims regarding computers "outstanding quality, reliability, and performance" were puffery); *Maio v. Aetna Inc.*, CIV. A. 99-1969, 1999 WL 800315, at *2 (E.D. Pa. Sept. 29, 1999) (statements regarding "high quality" of health care services were mere puffery), *aff'd*, 221 F.3d 472 (3d Cir. 2000).

[75] *Id*. at 16–18.

[76] Opposition Memorandum at 16–18, 20–21.

[77] First Amended Complaint at 20, ¶ 52.

[78] Exhibits C, docket no. 2-2, filed Oct. 7, 2013.

[79] Exhibit D, docket no 2-2, filed Oct. 7, 2013.

Plaintiffs compare IHC's representations regarding "best medical practices" to the misrepresentations in *Dyson, Inc. v. Bissell Homecare, Inc.*[80] In that case, the court found that a vacuum manufacturer materially misrepresented its product by labelling vacuums as "HEPA," a term with a technical meaning in the relevant market.[81] The defendants in that case argued that the statements were not misleading because there was no uniformly accepted "HEPA" standard.[82] The court rejected that argument, holding that plaintiffs had adequately shown that "HEPA" conveys a specific claim regarding the efficiency of the vacuum's filter—that the filter has "a minimum efficiency of 99.97% for 0.3 micron particles when tested at the application's rated air flow."[83] Plaintiffs in this case believe that they can similarly show that 'best medical practices' conveys a specific claim in the market for medical services regarding the nature of the care in question.

IHC's statements are importantly different from the misrepresentations in *Dyson*. Unlike in *Dyson*, the "best medical practices" statements do not concern any particular products or services. Rather, the statements are made in the context of advertising concerning IHC's care generally. Even if the statements were made about IHC's stroke and TIA services in particular, they would still be claims as to the high quality of those services generally and not claims concerning some particular quality or characteristic of the services.

A consumer might well rely on a "HEPA" label attached to a particular vacuum cleaner in choosing which to purchase. Such a label provides the consumer valuable and specific information regarding a particular characteristic of the vacuum—its filtering efficiency. By

---

[80] 951 F. Supp. 2d 1009, 1029 (N.D. Ill. 2013).

[81] *Id.* at 1029.

[82] *Id*.

[83] *Id*.

contrast, no reasonable consumer would rely on IHC's "best medical practices" statements regarding its services as a whole in making choices about where to receive stroke and TIA treatment in particular. Plaintiffs could state a claim if they alleged that IHC stated that its stroke and TIA patients are seen within 48 hours by a board certified vascular neurologist, for instance. Plaintiffs do not make such an allegation. Similarly, Plaintiffs might be able to state a claim if they alleged that IHC specifically stated that its practice of refusing to either hospitalize stroke and TIA patients or to refer such patients to a same day stroke or TIA clinic is in accord with the best medical practices. Plaintiffs do not allege that IHC made any such claims.

In addition to being addressed to IHC's full range of services and not to some feature of its stroke and TIA care, the "best medical practices" statements are phrased to strongly suggest puffery. One of IHC's "best medical practices" statements defines 'best medical practices' to mean "what works best."[84] The claim to have the best or highest quality product or service is paradigmatic puffery.[85] The other "best medical practices" statement does not define the term, but merely states that IHC "contributes in essential ways to the sharing of best medical practices . . . ."[86] Whatever exactly it means to "contribute in essential ways to the sharing of best medical practices," no reasonable consumer would rely on the claim in choosing IHC as its stroke and TIA treatment provider.

IHC's general marketing claims are puffery for which it is not liable under the Lanham Act.

---

[84] Exhibit D, docket no 2-2, filed Oct. 7, 2013.

[85] *See Language Line Servs., Inc. v. Language Servs. Associates, LLC,* C 10-02605 JW, 2011 WL 5024281, at *12 (N.D. Cal. Oct. 13, 2011) (holding that claim to have "taken the lead on setting standards and best practices for interpreter quality and training" was mere puffery); *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 708 F. Supp. 2d 1209, 1241 (D.N.M. 2010) (claim that product was "best in the world" was mere puffery); *Maio v. Aetna Inc.*, CIV. A. 99-1969, 1999 WL 800315, at *2 (E.D. Pa. Sept. 29, 1999) (statements regarding "high quality" of health care services were mere puffery), *aff'd*, 221 F.3d 472 (3d Cir. 2000).

[86] Exhibits C, docket no. 2-2, filed Oct. 7, 2013.

## 2. Misleading Statements as to the Number of Stroke Specialists Employed by IHC

Plaintiffs claim that IHC misleads patients and consumers to believe that it employs more specialists in stroke and TIA treatment than it in fact does. IHC argues that the accused statements are true and not misleading.[87] IHC is correct.

Plaintiffs note that stroke care is not its own category on the IHC website, but is listed under "Heart and Vascular Services."[88] The "Find a Doctor" link accessible from the portion of IHC's website devoted to stroke care provides a list of heart and vascular surgeons, but not vascular neurologists or stroke specialists.[89] According to Plaintiffs, these features of the website induce consumers and patients to falsely believe that the heart and vascular physicians employed by IHC specialize in stoke and TIA treatment.[90]

"[I]t is entirely unlikely that members of the public would be deceived in the manner described by Plaintiff."[91] The "Find a Doctor" link accessible from the portion of IHC's website devoted to stroke care brings up a list of physicians.[92] Next to the name of each physician on that list is the physician's primary area of specialization.[93] Clicking on the physician's name provides access to additional information regarding the physician, including additional areas of specialization, practice areas, board certifications, etc.[94] The information does not state that any

---

[87] Motion to Dismiss at 20.

[88] First Amended Complaint at 25, ¶ 62.

[89] *Id*. at 26, ¶ 65.

[90] *Id*. at 26, ¶ 66.

[91] *Videtto v. Kellogg USA*, 2:08CV01324-MCEDAD, 2009 WL 1439086, at *3 (E.D. Cal. May 21, 2009) (granting motion to dismiss claim for false advertising because statements were not misleading). *See also Vincent v. Utah Plastic Surgery Soc.*, 2:12-CV-1048 TS, 2013 WL 4782354, at *12 (D. Utah Sept. 5, 2013) (same).

[92] Intermountain Healthcare, Heart & Vascular Services, Find a Doctor, http://intermountainhealthcare.org/services/heart/heartdoctors/Pages/home.aspx (last visited Feb. 27, 2014); Exhibit J, docket no. 2-3, filed Oct. 7, 2013.

[93] *Id*.

[94] *Id*.

of the physicians specialize in stroke or TIA treatment. The fact that the list is accessible from the stroke care portion of IHC's website may suggest that some of the physicians listed are competent to provide stroke and TIA treatment. Plaintiffs do not allege that that claim is false, claiming only that these physicians do not "specialize in the treatment of stroke and TIA . . . ."[95]

Given the extensive information regarding the physicians' areas of focus and specialization, there is no reason to believe that patients or consumers would infer that some or all of those physicians specialize in—and do not merely have competence with respect to—the treatment of stroke. IHC could be more forthright regarding their physicians' expertise and competence only by providing an affirmative warning that particular physicians are not specialists in stroke and TIA treatment. Plaintiffs do not cite any authority for the proposition that the Lanham Act would require such a warning.[96]

Similarly, IHC states that its Neuroscience Institute—advertised as offering stroke patients with resources for "ongoing medical needs after hospitalization"—employs "subspecialists including epileptologists, general neurologists, physical medicine and rehabilitation physicians, and neuropsychologists."[97] Plaintiffs claim that this statement misleadingly suggests that those health care providers are "subspecialists" in the treatment of stroke.[98] Consumers and patients are unlikely to take this statement to say anything other than what it does: that neuropsychologists, for instance, are subspecialists available to assist stroke patients with on-going medical needs.

Plaintiffs' claim under the Lanham Act with respect to these statements is dismissed.

---

[95] First Amended Complaint at 25, ¶ 62.

[96] *See Berthold Types Ltd. v. Adobe Sys., Inc.*, 101 F. Supp. 2d 697, 699 (N.D. Ill. 2000) (rejecting Plaintiff's argument that defendant engaged in misrepresentations where defendant could only cure the alleged problem by prominently displaying a warning).

[97] First Amended Complaint at 27–28, ¶ 69.

[98] *Id.*

### 3. Code of Ethics Statements

Plaintiffs claim that IHC's Code of Ethics falsely states that IHC will avoid compensation arrangements in excess of fair market value and will comply with federal laws that prohibit rewards to physicians for referrals. IHC argues that the claims are true and not misleading.[99] IHC is correct.

IHC's Code of Ethics states that IHC "[a]void[s] compensation arrangements in excess of fair market value" and "actions that inappropriately create revenues for [IHC], such as intentionally billing claims incorrectly."[100] The Code of Ethics also states that "[a]ll business dealings must be reasonable and may not provide an excessive financial benefit to any party."[101] Finally, the Code of Ethics states that IHC:

> carefully review[s] financial relationships with physicians and other health care practitioners for compliance with the anti-kickback and Stark laws. All financial arrangements and contracts with physicians and physician groups must have legal Department review. Intermountain will not improperly induce or reward referrals of patients or services as prohibited under these laws and regulations.[102]

Plaintiffs allege that these claims are false or misleading.[103] They claim that IHC's refusal to refer patients to the Stroke Center or provide insurance coverage for treatment at the Stroke Center inappropriately creates revenue for IHC, constitutes a compensation arrangement in excess of fair market value, and provides an excessive financial benefit to IHC.[104] Plaintiffs also allege that the claims in the Code of Ethics are false because IHC recently entered into a settlement agreement with the Department of Justice to resolve claims associated with a

---

[99] Motion to Dismiss at 20.

[100] Exhibit N, docket no. 2-3, filed Oct. 7, 2013.

[101] *Id.*

[102] *Id.*

[103] First Amended Complaint at 30, ¶¶ 77–83.

[104] *Id.*

compensation arrangement that improperly rewarded physicians for referrals in violation of federal law.[105]

IHC's Code of Ethics is addressed to its workforce and is designed to "ensure that we all [IHC employees, clinicians, vendors, trustees, volunteers, and other business partners] clearly understand our responsibilities as well as the potential consequences of misconduct."[106] It does this by articulating ethical standards, as well as the disciplinary action that may result from violation of those standards.[107] The Code of Ethics does not suggest that IHC or its employees uniformly meet the ethical standards outlined in the Code of Ethics. To the contrary, the document sets out consequences for violating those standards and notes that "[e]ach of us is responsible to report concerns and suspected misconduct that could violate [IHC's] Code of Ethics, state or federal laws, or [IHC] policy."[108]

Because the Code of Ethics provides only ethical standards, the statements to which Plaintiffs point in the Code of Ethics are neither false nor misleading. The Code of Ethics explicitly anticipates that its ethical standards are not always met by providing that violations must be reported and specifying remedial actions. IHC's settlement with the Department of Justice, for instance, occurred when IHC self-reported compensation arrangements that may have violated federal law.[109] In recognizing a potential violation of one of its ethical standards, reporting that violation, and accepting the consequences, IHC acted in exactly the way contemplated by the Code of Ethics. Similarly, IHC's standard regarding the avoidance of

---

[105] *Id.* at 32, ¶ 87.

[106] Exhibit N, docket no. 2-3, filed Oct. 7, 2013.

[107] *Id.*

[108] *Id.*

[109] Motion to Dismiss at 13–14; Exhibit O, docket no. 2-3, filed Oct. 7, 2013.

"actions that inappropriately create revenues" does not make its decision not to do business with the Intermountain Stroke Center false advertising.[110]

Further, Plaintiffs can state a claim under the Lanham Act with respect to supposed misrepresentations only if they can plausibly allege a competitive injury resulting from those misrepresentations. Plaintiffs have not adequately alleged injury with respect to the statements in IHC's Code of Ethics. Plaintiffs' allegations regarding injury are extremely conclusory. With respect to all of the supposed misrepresentations, Plaintiffs state only that "[a]s a direct and proximate result of [IHC's] false and deceptive ad campaign, Dr. Nancy Futrell and the Stroke Center have suffered significant monetary damages and discernible competitive injury."[111] Other than these conclusory allegations, Plaintiffs fail to provide any factual basis for a plausible claim that the statements in the Code of Ethics diverted patients from the Stroke Center or in any other way created a competitive harm.[112]

As Plaintiffs note,[113] the Tenth Circuit Court of Appeals previously held that a complaint adequately alleged injury in a claim for false advertising where it merely stated that the defendant's misrepresentations caused the plaintiff "to lose customers and sales, resulting in business losses . . . ."[114] In that case, the alleged misrepresentation was a label claim on the defendant's product and directly concerned the product's characteristics and effectiveness.[115] It

---

[110] Exhibit N, docket no. 2-3, filed Oct. 7, 2013.

[111] First Amended Complaint at 40, ¶ 114.

[112] *See Stahl Law Firm v. Judicate W.*, C13-1668 TEH, 2013 WL 6200245, at *7 (N.D. Cal. Nov. 27, 2013) (holding that plaintiff's complaint failed to state a claim under the Lanham Act where plaintiff made merely conclusory allegations regarding injury allegedly suffered as a result of false advertising); *Nationwide CATV Auditing Servs., Inc. v. Cablevision Sys. Corp.*, 12-CV-3648 SJF ETB, 2013 WL 1911434, at *12–13 (E.D.N.Y. May 7, 2013) (dismissing plaintiff's unfair competition and Lanham Act claims because plaintiff failed to adequately allege that the alleged misrepresentations would cause actual consumer harm).

[113] Opposition Memorandum at 27–28.

[114] *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1257 n.4 (10th Cir. 1999).

[115] *Id*. at 1250.

is plausible that such a misrepresentation might result in a competitive injury. A consumer looking at each of the two products might choose the defendant's product rather than the plaintiff's because the label on the former, but not the latter, touts a certain benefit.

By contrast, the alleged misrepresentation in this case does not concern IHC's stroke care. Rather, it concerns the manner in which IHC conducts its business generally. It is not plausible that a consumer or patient attempting to decide between stroke treatment at IHC or the Stroke Center would be influenced by representations regarding IHC's general business practices in a Code of Ethics intended primarily for IHC employees. Based solely on the nature of the alleged misrepresentation, it is not plausible that Plaintiffs have suffered a competitive injury. To state a claim under the Lanham Act, Plaintiffs' complaint must include additional factual allegations which make it plausible that the statements in the Code of Ethics have harmed them.

Plaintiffs' complaint makes repeated references to harm suffered by the Stroke Center as a result of IHC's business practices. Plaintiffs claim, for instance, that IHC "refused to allow the vast majority of its stroke and TIA patients to receive treatment at the Stroke Center"[116] and that patients who were referred to the Stroke Center "could not independently afford to pay for these [Stroke Center] treatments" because "SelectHealth refused to cover the medical expenses."[117] Plaintiffs may have been harmed by these business decisions, but that harm is irrelevant to their claim under the Lanham Act. To state a claim under the Lanham Act, the misrepresentation *itself* must give rise to a competitive harm.[118] Plaintiffs' complaint does not include any allegation— much less a plausible allegation—that the Stroke Center lost patients or was in some other way

---

[116] First Amended Complaint at 30, ¶ 80.

[117] *Id*. at 43, ¶ 127.

[118] *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 873 (10th Cir. 1995). *See also Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005) (holding that a false advertising claim under the Lanham Act requires the plaintiff to allege "(1) a commercial injury based upon a misrepresentation about a product; and (2) that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the defendant").

placed at a competitive disadvantage by IHC's alleged misrepresentations in the Code of Ethics. Plaintiffs claim to have been harmed by the business conduct that allegedly rendered the claims in the Code of Ethics false or misleading, not the misleading statements themselves.[119]

Plaintiffs do not say how the representations in IHC's Code of Ethics may have harmed their ability to compete with IHC. The complaint does not adequately allege a competitive injury associated with those statements. Further, those statements are not misleading. Plaintiffs' claim under the Lanham Act with respect to these statements is dismissed.

### 4. IHC's "Life After Stroke or TIA" Pamphlet

Plaintiffs' allege that IHC's pamphlet—"Life After a Stroke or TIA"—violates the Lanham Act.[120] Plaintiffs are incorrect. The pamphlet is not misleading as to the nature, characteristics, or qualities of IHC's services.

The IHC pamphlet is directed at patients, to "guide you through your initial recovery period," and the families of patients, to "learn more about stroke, stroke recovery, and what you can do to help your loved one heal."[121] Page ten of the pamphlet, titled "Aftercare—keep your follow-up appointments," states that "[i]n the first few weeks after your discharge, you'll need to see members of your medical team. Use the chart below to keep track of these important appointments."[122] The page includes a chart for tracking the dates and times of medical appointments. The second entry on the chart is for an appointment with a neurologist and provides that the appointment is "usually recommended 4 to 6 weeks after you leave to go

---

[119] *Nationwide CATV Auditing Servs., Inc. v. Cablevision Sys. Corp.*, 12-CV-3648 SJF ETB, 2013 WL 1911434, at *12 (E.D.N.Y. May 7, 2013) (dismissing unfair competition claim where plaintiff could provide only "conclusory allegations" as to injuries resulting from alleged misrepresentations regarding defendant's conduct, though plaintiff may well have been harmed by the conduct itself).

[120] First Amended Complaint at 23–24, ¶ 59.

[121] Exhibit K, docket no. 2-10, filed Oct. 7, 2013.

[122] *Id.*

home."[123] Plaintiffs claim that IHC's pamphlet is likely to mislead TIA patients to believe that they can "safely wait 4 to 6 weeks before following up with a neurologist."[124]

The pamphlet appears to be directed to patients who have been admitted to, and are being discharged from, an IHC hospital. The page that is allegedly misleading states that patients should attempt to keep appointments "[i]n the first few weeks after your discharge . . . ."[125] Similarly, the pamphlet includes a section titled "Before you leave the hospital . . . ."[126] Plaintiffs allege that the standard of care with respect to stroke and TIA treatment requires either hospitalization or referral to a same day stroke and TIA clinic to see a neurologist within forty-eight hours.[127] Because the pamphlet appears to be directed to those who have already been hospitalized, it is unlikely consumers would believe that the pamphlet is recommending something less than the standard of care regarding hospitalization.

Even if—as Plaintiffs suggest might happen[128]—a TIA patient treated in an IHC emergency room and not hospitalized is led to believe that it is safe to wait four to six weeks to see a neurologist, the pamphlet does not mischaracterize or misrepresent "the nature, characteristics, [or] qualities"[129] of IHC's services. The pamphlet provides only very general information concerning stroke, what stroke patients can expect, how to recover from a stroke, and how to avoid another stroke. IHC is referenced only twice in the thirty-five page pamphlet. It is listed as an author on the first page and is listed as a resource for stroke rehab and support

---

123 *Id.*

124 *Id.*

125 *Id.*

126 *Id.*

127 First Amended Complaint at 14, ¶ 30.

128 *Id.* at 23–24, ¶ 59.

129 15 U.S.C. § 1125(a)(1)(B) (2012).

groups on the last page.[130] The document is not reasonably read as suggesting any claims at all about IHC's stroke or TIA care.

Plaintiffs' claim under the Lanham Act with respect to the statements in IHC's "Life After Stroke or TIA" pamphlet is dismissed.

### C.  State Law Claims

Jurisdiction over Plaintiffs' state law claims is proper only because they are appropriately related to Plaintiffs' Lanham Act claim.[131] The Tenth Circuit has stated that "pendent jurisdiction over state claims is exercised on a discretionary basis," but generally "[i]f federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."[132] This general rule is supported by principles of comity and federalism which suggest that state courts are best equipped to interpret, apply, and develop state law.[133]

There is good reason in this case to remand the state law claims to state court. The parties disagree as to the interpretation of Utah's Truth in Advertising Act[134] and the application of Utah's common law tort of intentional interference with actual and prospective economic relations.[135] There is also a disagreement between the parties regarding the effect—if any—that provisions of the Utah Insurance Code governing preferred provider contracts[136] may have upon

---

[130] Exhibit K, docket no. 2-10, filed Oct. 7, 2013.

[131] 28 U.S.C. § 1367(a) (2012).

[132] *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (internal quotation marks omitted) (quoting *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997)).

[133] *Id.*

[134] Motion to Dismiss at 10–14; Opposition Memorandum at 22–24.

[135] Motion to Dismiss at 22–26; Opposition Memorandum at 29–33.

[136] Utah Code Ann. § 31A-22-617 to 617.1 (West).

Plaintiffs' state law claims. According to IHC, those provisions pre-empt Plaintiffs' state law claims.[137] Plaintiffs deny that they do so.[138] These are all issues best left to state courts.

Plaintiffs' state law claims are remanded.

## ORDER

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss the First Amended Complaint[139] is granted with respect to Plaintiffs' claim under the Lanham Act.

IT IS FURTHER ORDERED that Plaintiffs' remaining claims are remanded to the Third Judicial District Court for Salt Lake County, State of Utah, for additional proceedings.

DATED this 31st day of March, 2014.

David Nuffer
U.S. District Judge

---

[137] Motion to Dismiss at 10–14.

[138] Opposition Memorandum at 1–15.

[139] Docket no. 7, filed Oct. 9, 2013.